## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **ERIC BARNARD,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:15CV00160 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **HAROLD CLARKE, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Eric Barnard, Pro Se Plaintiff; Nancy Hull Davidson, Office of the Attorney General of Virginia, Richmond, Virginia, for Defendants.*

The plaintiff, Eric Barnard, a state prison inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983. Barnard asserts constitutional challenges to certain classification procedures that have allegedly prevented him from earning his release from the highly restrictive segregation conditions at Red Onion State Prison ("Red Onion") in Pound, Virginia. Specifically, he claims that he has been wrongly assigned to Intensive Management ("IM") housing, a status at Red Onion that is more restrictive and has fewer privileges than the similar classification of Special Management ("SM") and the general population. After review of the record, I conclude that the defendants' Motion for Summary Judgment must be granted.

I.

Barnard was one of ten inmates received by Red Onion from the Colorado Department of Corrections ("CODOC") on June 29, 2014. Officials assigned all of these incoming inmates to segregation for administrative reasons, pending their review by the Institutional Classification Authority ("ICA"). Barnard is serving a sentence of life without parole for a conviction of first degree murder in Colorado. He has additional sentences for convictions of murder, robbery, motor vehicle theft, and assault while incarcerated.

Red Onion and its sister facility, Wallens Ridge State Prison ("Wallens Ridge"), house all Virginia Department of Corrections ("VDOC") "Level S" inmates. Level S is reserved for inmates who must be managed in a segregation setting.[1] Under current policies, once a VDOC inmate is classified as Level S, officials transfer him to one of these facilities, where he may participate in the Segregation Reduction Step-Down Program designed to help him progress in stages toward a return to the general prison population. (Operating Procedure ("OP") 830.A, at 8-28, ECF No. 31-1.) This OP became effective on February 18,

---

[1] According to the VDOC operating procedure for security level classification, inmates are classified to Level S based on "segregation qualifiers," including the following: aggravated assault on a staff person or on another offender using a weapon or resulting in serious injury; serious risk of escape; "[c]ommission of a crime of exceptional violence and/or notoriety"; "[e]xcessive violent [d]isciplinary [c]onvictions"; fire setting or rioting in prison that harmed a person or caused extensive property damage; hostage taking; possessing firearms or other weapons; gang activity or leadership; and manipulating staff or displaying predatory behavior. (*See* OP 830.2(IV)(G)).

2013, with the stated purpose to provide "established procedures for incentive based offender management which will create a pathway for offenders to step-down from Security level S to lower security levels in a manner that maintains public, staff and offender safety." (OP 830.A(I).) The step-down program is goal-oriented: when inmates exhibit positive behaviors, such as anger management and respect, and succeed in completing the established goals in each stage of the procedure, they are rewarded by moving to the next step and earning its additional privileges.

As described in OP 830.A(III), each newly classified Level S inmate is assessed and assigned to the appropriate privilege level within Level S: intensive management ("IM"), special management ("SM"), or the reentry unit (reserved for inmates within two years of release). An inmate is assigned to IM status if evaluators determine that he has "the potential for extreme and/or deadly violence," as indicated by a history of violent disciplinary infractions against staff or other inmates, or an "extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavior characteristic." (OP 830.A(III).) The policy expressly states that "[t]he potential for extreme or deadly violence is not eliminated despite the offender's daily institutional adjustment even when providing more than a year of compliant, polite, and cooperative behavior and attitude." (*Id.*)

-3-

Alternatively, an inmate may be placed in IM status because of his "routinely disruptive and threatening pattern of behavior and attitude" or because he is "incarcerated for a notorious crime that puts [him] at risk from other offenders." (*Id.*) On the other hand, an inmate is assigned to SM status if evaluators find that he has a history of "repeated disruptive behavior at lower level facilities, . . . fighting with staff or offenders, and/or violent resistance" that harmed staff or other inmates, but "without the intent to invoke serious harm, . . . kill, or [cause] serious damage to the facility." (*Id.*)

Inmates are further sub-classified under OP 830.A as follows, starting with IM-0, the most restrictive status, and ending with the general population, the least restrictive.

> Intensive Management (IM):
> IM-0
> IM-1
> IM-2
> IM-SL6
> Special Management (SM):
> SM-0
> SM-1
> SM-2
> SM-SL6
> Step-Down—Level VI General Population
> Structured Living—Phase 1 and Phase 2
> Security Level V General Population

The step-down program in OP 830.A is a so-called cognitive program that includes pro-social goals and requires the inmate to complete a workbook set called the

*Challenge Series*, remain infraction free, meet responsible behavior goals, and participate in self-improvement and education programs. When an inmate meets the goals designated for a step, he may be advanced to the next step and receive the additional privileges assigned to it.

All Level S inmates in the IM and SM categories are housed in single cells and, until they reach the SM-SL6 stage, are restrained in handcuffs and shackles and escorted by two officers whenever they leave their cells. Per policy, they receive meals in their cells (the same types of meals that inmates in general population units receive), receive not less than three showers per week, and have out-of-cell recreation for one hour, five days per week. These inmates generally can have two twenty-minute phone calls per month, one one-hour, non-contact visit per week, limited use of radio and television, and limited commissary purchases. They can possess at least two library books per week, receive and send mail, and possess legal and religious materials. The privileges an IM inmate may earn under OP 830.A at IM-1 and IM-2 include more library books per week, more commissary purchases, more non-contact visits or telephone calls, increased TV time and channels, and even limited job possibilities. An inmate progressing to SM-1 or SM-2 can earn even greater privileges.

IM or SM inmates who do not meet the standards for discipline, responsible behavior, self-improvement, and programming can be moved back to a lower step.

Some inmates assigned to a lower step may be required to start over with the *Challenge Series*; they must then work with treatment staff to complete its exercises again to achieve positive changes in thought processes and social skills. An inmate's refusal to participate in the step-down program may also be grounds for a reduction in his step assignment back to IM-0 or SM-0, where he may remain, stripped of the privileges he had earned in the higher step, until he chooses to participate.

Members of the Unit Management Team, a multi-disciplinary group of staff who work in the housing units, track and rate each inmate's progress toward the goals of his assigned step. They rate his behavior every week as poor, acceptable, or good in each of several categories, such as personal hygiene, standing for count, and respect. Counselors rate the inmate's program participation every week as incomplete, complete, or positive effort. Officers in each of these groups are encouraged to communicate with inmates about these ratings — to acknowledge positive performance and motivate improvement where needed. (OP 830.A(IV)(D).)

When an inmate completes the *Challenge Series* curriculum and evaluators deem that he has achieved its behavioral goals in SM-2, he is stepped down in security level from Level S to SM-SL6. (OP 830.A(IV)(F).) At this point, officials assess each inmate and assign him to one of three SL6 program pods

geared to safely reintroduce him into a social environment to interact with other inmates and test his readiness for possible transfer to Level V and, eventually, to other non-segregation settings.  (*Id.*)

Inmates in the SL6 step-down pod may progress through two phases.[2]  In SL6 Phase 1, they are still in single cells, but they are permitted to leave their cells unrestrained for movement to the shower and recreation and, gradually, to participate in the *Thinking for a Change* curriculum with other inmates in groups of up to fifteen participants.  (*Id*.)  Inmates in SL6 Phase 2 are double-celled and unrestrained for showers and recreation, they have outside recreation with other inmates for an hour, twice a week, and they can walk to meals with other inmates to eat their meals together in the dining hall.

The IM pathway under OP 830.A is different than the SM pathway.  If an inmate reaches IM-2 status, and officials determine that he cannot progress to the SM steps toward classification to the SL6 pods, he can become eligible for assignment to the lowest security level for an IM status inmate: Level 6-IM, also known as the Closed Pod.  The Closed Pod is expressly designed "to create an

---

[2]  In addition to the SM-SL6 step-down pod, inmates at this stage may be assigned to: (a) the secure allied management ("SAM") pod, designed for inmates who may be vulnerable to victimization because of cognitive impairment or other factors; or (b) the secure integrated pod ("SIP"), designed for inmates who intentionally commit multiple minor disciplinary infractions to stay in segregated housing.  The programming in the SAM and SIP pods differs from the step-down pod and is intended to assess inmates' ability to socialize safely with other inmates and encourage them toward a move to a general population.

opportunity for an increased quality of life for offenders possibly facing a long term in high security."[3]  (OP 830.A(IV)(G)(1).)  Closed Pod inmates continue to have single-celled housing, segregated showers and recreation areas, and out-of-cell restraints, shackles, and dual escorts.  Closed Pod inmates can, however, earn more privileges than any other group of IM inmates, such as more in-pod job assignments, more programming in-cell and in small groups in secure chairs, video visitation, and longer in-person visitation.

In addition to the weekly progress ratings by the Unit Management Team, OP 830.A(IV)(K)(5) requires that all segregation inmates, including those participating in the step-down program, be routinely reviewed by the ICA.  (OP 830.1, at 29-37, ECF No. 31-1.)  According to OP 830.A, Appendices F and G, Level S inmates are to receive an ICA review at least every ninety days.  Among other things, the ICA reviews and acts on recommendations for step increases or reductions.

---

[3]  OP 830.A(IV)(G)(2)(g) states:

Restricted freedoms and interaction with staff and other offenders for the IM population is temporary.  There is a strong commitment to develop a model to support an improved quality of life and greater opportunities for self-improvement for this dangerous population.  The goal is to develop a management strategy that includes reduced restrictions, increased freedoms, and increased unrestrained interactions with others.  However, at the time of this writing, guidelines or models are not available for predicting safety with a population that has a proven history of carrying out extreme and/or deadly violence.  Once the larger Step-Down plan in general is implemented and stable, attention will be focused on additional IM step-down opportunities.

In addition to Unit Management Team review of an inmate's classification status, certain classification decisions are also reviewed by a Dual Treatment Team made up of officials from both Red Onion and Wallens Ridge, by the wardens of the two institutions, or by the VDOC regional operations chief. In addition to this multi-level review scheme, according to OP 830.A(IV)(K)(1)(a), "[a] team external to [Red Onion and Wallens Ridge] will perform an annual review of each [Level S] offender's case." This review includes a reassessment of whether the inmate continues to meet the criteria for the IM or SM path to which he has been assigned. According to OP 830.1(IV)(G), all classification decisions may be appealed through the Offender Grievance Procedure, to which Level S inmates have access.

On July 14, 2014, the ICA recommended Barnard for assignment to security Level S. After a review in late September, the ICA recommended him for assignment to IM-0. The stated ICA rationale for this assignment was Barnard's recent arrival from Colorado under an interstate compact, his life sentence for murder and his other convictions, and staff reports that "[w]hile housed at the facility in Colorado Offender Barnard was part of the group that planned and carried out the murder of the Director of the [CODOC]." (Pl.'s V.S. Ex., at 3, ECF No. 3.) An administrative reviewer of the ICA recommendation commented: "Offender has involvement with the group that murdered the CODOC Director.

According to the offender, he still has contact with the family members of those that actually carried out the murder." (*Id.*) Barnard's Level S status was approved the next day.[4] When Barnard filed a grievance about his security level change, the warden responded that the ICA had assigned "Level S based on the serious nature of your crimes and your involvement in the murder of the Director of the [CODOC]." (*Id.*, at 6.)

The ICA reviewed Barnard on September 11, 2014 and assigned him to IM-0 without stating a written basis for that assignment. In a November review, the ICA noted Barnard's statement that "[t]he classification that I'm being held in seg. for, I have not been convicted of." (Defs.' Enclosure H, at 56, ECF No. 31-1.) The ICA recommended Barnard's advancement to IM-1, and this change was approved in January 2015. At Barnard's review on May 19, 2015, the ICA noted his statement that "[a]ll the documents that placed me in segregation have been proven false. I have no reason to be in segregation. All reports as to why i'm [sic] here never happened. Anything shy of removing me from segregation aren't correct." (Barksdale Aff. Enclosure I, at 57, ECF No. 31-1.) The ICA recommended that Barnard advance to IM-2, and this change was approved in June 2015. At his review on August 20, 2015, the ICA noted Barnard's statement that

_____

[4] The ICA conducted another review of Barnard's possible assignment to Level S on September 22, 2014 to correct some aspect of the initial review. The ICA again recommended Level S based on the reporting staff comments already stated.

"I'd like to go to population and be reviewed for a lower security level." (*Id.* Enclosure J, at 58, ECF No. 31-1.) The ICA recommended that Barnard be advanced to SM-2, and this change was approved in September 2015.

Liberally construed, Barnard's verified Amended Complaint under § 1983 claims that application of OP 830.A as to him, and particularly his classification to IM status, has unfairly prolonged his confinement under segregation conditions without federally required procedural protections, in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and that those conditions themselves have violated the Eighth Amendment's prohibition against cruel and unusual punishment. Barnard sues VDOC administrators for signing OP 830.A into effect and failing to correct the alleged constitutional violations. He also sues supervisory and treatment officials at Red Onion for the undesirable conditions and for improperly making or failing to correct the allegedly unfair classification decisions imposed on him under OP 830.A without sufficient due process. Barnard seeks monetary damages and injunctive relief ordering his transfer to a lower security level and prison facility.[5]

---

[5] Barnard's Amended Complaint sets out twenty-two numbered paragraphs of facts and overlapping claims, most of which fall into the due process, equal protection, and conditions claims I have summarized here. Four of Barnard's numbered paragraphs include concerns stemming from the initial decision for his transfer from the CODOC to Red Onion: (1) he was transferred from a lower security prison in Colorado to Red Onion with no disciplinary justification; (11) while in segregation, he cannot petition for clemency or a reduction of sentence under Colorado law; (14) he was transferred from

In Barnard's Amended Complaint and other submissions, he alleges that his assignments to Level S and IM status were not justified. He states that in the CODOC, he was in the general population at a Level 3 security prison, had not received any disciplinary charges in two years, and had received only two disciplinary charges in the last ten years. He complains that VDOC officials assigned him to Level S and IM status even before receiving his central CODOC file. According to Barnard, that file did not include any documentation showing that Barnard had been investigated for involvement in the murder of the CODOC director or that he had ever received criminal or disciplinary charges related to that murder.

Barnard also alleges that officials do not follow constitutional due process procedures or their own policies during reviews of inmates' classification statuses at Red Onion. He complains that he did not receive adequate notice and was not present at the first Level S review; that officials assigned him to Level S and IM status without reliable information or proof of wrongdoing; that he did not get any documentation of the reasons for his assignment to IM status and had no means to

---

the CODOC to Red Onion without due process; and (15) he has never been given any reason for the transfer. (Am. Compl. ¶¶ 1, 11, & 14-15, ECF No. 13.) He fails to allege how any of the defendants he names or the VDOC policy he challenges were in any way involved in these actions or caused these adverse effects. *See, e.g., Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (finding that, under § 1983, supervisory "liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiffs' rights"). Therefore, I will grant the defendants' Motion for Summary Judgment as to these aspects of Barnard's claims without further discussion here.

appeal; that the review process between the various IM and SM steps is not meaningful because it is not based on verified facts; that officials denied his grievance appeals about his Level S and IM assignments without properly investigating his circumstances; and that he cannot earn his way out of IM status by staying infraction free.

Barnard also complains about the ways IM and SM inmates are treated differently. He alleges that IM status permanently prevents an inmate from working his way out of segregated confinement at Red Onion despite his completion of the *Challenge Series*, while SM status inmates who complete the same series can work their way to lower level prisons. Barnard alleges that IM inmates have few privileges: limited telephone calls per month, little out-of-cell time or contact with others, recreation only one hour per day, five days per week, and no opportunities for jobs, education, or rehabilitative programs.[6] He also complains that IM inmates do not gain the same level of privileges after completing the steps in the IM pathway that SM inmates gain after completing their steps.

---

[6] Barnard alleges that general population inmates can make an unlimited number of telephone calls, be out of their cells most of the day, have jobs, and attend programming, while IM status inmates do not enjoy these privileges. The record reflects that SM status inmates also do not have these general population privileges, since such privileges apply only to inmates who are not classified as Level S.

## II.

### A. Standard of Review.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

I must draw all reasonable inferences from the facts in favor of Barnard, the nonmoving party. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004). Detailed factual allegations in a verified, pro se complaint may be sufficient to withstand a motion for summary judgment with supporting affidavits containing a conflicting version of the facts. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." (emphasis omitted) (citation omitted)). However, Barnard cannot defeat the defendants' properly supported summary judgment motion with mere groundless generalizations or speculation. *Glover v.*

-14-

*Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact.").

### B.  Due Process.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.  "To state a procedural due process violation,[7] a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law."  *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015).  "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies."  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

As a convicted prisoner, Barnard does not have an inherent, constitutionally protected liberty interest in release from a more restrictive security classification.  *Id.* at 221-22.  A state-created liberty interest may exist, however, if Barnard (a)

---

[7]  Barnard may also be contending that OP 830.A violates his substantive due process rights.  Such a claim fails, however.  It is well established that "the Due Process Clause affords [the inmate] no greater protection than does the Cruel and Unusual Punishment Clause."  *Whitley v. Albers*, 475 U.S. 312, 327 (1986).  Thus, Barnard's claims that living conditions in segregation constitute punishment without a legitimate penological purpose and inflict physical harm on him "fall squarely within the ambit of the Eighth Amendment — not the due process clause."  *See Prieto v. Clarke*, 780 F.3d 245, 251 (4th Cir. 2015).  Therefore, I will address Barnard's complaints about the ill effects of living conditions at Red Onion separately, under the applicable legal standard for Eighth Amendment claims.

points to "a basis for an interest or expectation in state regulations" in avoiding the conditions of his confinement under the segregation classification scheme at Red Onion, *Prieto*, 780 F.3d at 250; and (b) shows that those conditions "impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). Only if Barnard makes both showings does the Due Process Clause require a particular measure of procedural protection before he can be deprived of his liberty interest. *Id.*

Barnard contends both that he was assigned to Level S and to IM status instead of SM status under OP 830.A without due process and that subsequent classification adjustment decisions within those two pathways occurred without due process. The defendants agree that OP 830.A "creates an expectation that 'S' level offenders will receive reviews of their classification status." (Defs.' Mem. Supp. Summ. J. 22, ECF No. 31.) Specifically, OP 830.A(IV)(K)(5) and Appendices F and G provide that the ICA will review inmates every ninety days and decide whether to advance them to the next status level in the step-down procedures. I conclude that this periodic review policy creates a potential liberty interest for Barnard in being released from the restrictive conditions of his current security classifications. *See Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2016) (finding that state prison's policy requiring periodic classification reviews for segregation inmates created potential liberty interest).

-16-

I must next determine if Barnard's continued confinement in the various segregation classifications within the OP 830.A categories imposes "atypical and significant hardship" compared to the "ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. The "conditions dictated by a prisoner's conviction and sentence are the conditions constituting the 'ordinary incidents of prison life' for that prisoner." *Prieto*, 780 F.3d at 253. Neither party has provided me specific information about restrictive conditions, if any, dictated by Virginia law for an inmate like Barnard, who is serving a life sentence without parole, imposed in another state. Given Barnard's transfer to Red Onion from a lower security level prison in Colorado, where he enjoyed more out-of-cell activity, I will use the general population status as the normative baseline for his due process claim. *See Incumaa*, 791 F.3d at 527 (concluding "that the general population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence").

The atypical hardship requirement is difficult to satisfy. Mere limitations on privileges, property, and activities for administratively segregated inmates, and even disciplinary action "in response to . . . misconduct fall[ ] within the expected perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485; *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (holding that "changes in a

prisoners' [sic] location, variations of daily routine, changes in conditions of
confinement (including administrative segregation), and the denial of privileges —
matters which every prisoner can anticipate are contemplated by his original
sentence to prison — are necessarily functions of prison management that must be
left to the broad discretion of prison administrators to enable them to manage the
prisons safely and efficiently"). It is well established that a temporary assignment
to segregated confinement — thirty days or even six months, with reduced
privileges, few out-of-cell activities or socialization opportunities, and heightened
security measures — is not atypical or significant hardship. *See Sandin*, 515 U.S.
at 485-86; *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (finding six months
under conditions dictated by administrative segregation policies was not atypical
under *Sandin*). Moreover, "[t]he State's first obligation must be to ensure the
safety of guards and prison personnel, the public, and the prisoners themselves."
*Wilkinson,* 545 U.S. at 227. Thus, "correctional officials . . . must have substantial
discretion to devise reasonable solutions to the problems they face" in maintaining
prison security and safety. *Florence v. Bd. of Chosen Freeholders*, 132 S. Ct.
1510, 1515 (2012).

   Most importantly, the Supreme Court has consistently employed a due
process analysis that encourages prisons to implement written management
policies while minimizing the involvement of the federal courts "in the day-to-day

-18-

management of prisons." *Wilkinson*, 545 U.S. at 222 (citing *Sandin*, 515 U.S. at 482-83). "This approach . . . provides inmates and prison administrators with clear notice of a prisoner's rights, but it also permits a given state to codify procedures establishing very restrictive confinement conditions." *Prieto*, 780 F.3d at 255. District courts must respect the Supreme Court's "judgment that this trade-off strikes the correct balance between the dictates of the Due Process Clause and the pressures on state correctional systems." *Id.*

In *Wilkinson*, without a point-by-point comparison of segregation and general population conditions, the Supreme Court found that inmates had a protected liberty interest in avoiding assignment to a particular state "supermax" prison. In reaching this conclusion, the Court carefully distinguished the supermax conditions from normal segregation unit conditions on three grounds. First, inmates in the supermax facility were "deprived of almost any environmental or sensory stimuli and of almost all human contact."[8] *Wilkinson*, 545 U.S. at 214. Second, they were assigned for "an indefinite period of time, limited only by [the] inmate's sentence." *Id.* Third, once assigned to supermax, "[i]nmates otherwise

---

[8] The conditions at the supermax at issue in *Wilkinson* included the following: "Almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room." *Id.* at 223-24. The Court noted, however, that the lack of human contact was the most distinctive of these living conditions and that the conditions were atypical when combined with the additional factors of indefinite duration and disqualification for parole. *Id.* at 224.

-19-

eligible for parole lose their eligibility while incarcerated" at the facility. *Id.* at 215. The Court stated: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.* at 224.

Similarly, in *Incumaa*, the Fourth Circuit found a protected liberty interest in avoiding assignment to South Carolina's supermax based on the isolating and restrictive nature of the living conditions combined with the length and indefiniteness of the plaintiff's twenty-year confinement there. 791 F.3d at 531-32. In addition to conditions similar to those at issue in *Wilkinson*, the plaintiff in *Incumaa* was subjected to "a highly intrusive strip search every time he [left] his cell." *Id.* at 531.

Prison policies gave rise to the indefinite terms of supermax confinement that concerned the courts in these cases. In *Wilkinson*, prison policies provided "no indication how long [an inmate] may be incarcerated [at the supermax] once assigned there." 545 U.S. at 215. In addition, policy required infrequent review of the continued appropriateness of an inmate's specific segregation status: once initially, thirty days after his arrival, and annually thereafter. *Id.* at 217. The policy at issue in *Incumaa* required review of the plaintiff's status every thirty days by an institutional classification committee ("ICC"), but that review process provided no clear criteria for him to become suitable for release from the

-20-

supermax. 791 F.3d at 522-23. Assigned to the supermax as a member of a security threat group, policy provided that the plaintiff could nevertheless qualify for reclassification and release from the supermax by achieving an "improvement in behavior level." *Id.* Policy further defined "behavior level" as including a clear disciplinary record and the ICC's evaluation of the plaintiff's overall compliance with "policies and procedures" of the institution. *Id.* at 522. In twenty years, the plaintiff had never incurred a disciplinary infraction, but the ICC repeatedly recommended his retention at the supermax without providing any behavioral basis for doing so. *Id.* at 521-23.

Without question, VDOC inmates classified to Level S, particularly those assigned IM status, are confined under highly restrictive conditions at Red Onion, including single-cell assignment, limited out-of-cell activity and face-to-face contact with other inmates, and movement outside the cell only in full restraints and with dual escort. Out-of-cell movement may also involve a visual strip search, although the parties do not present evidence on this issue. The mere existence of these conditions at Red Onion, however, does not render confinement there atypical or significantly harsh, because general population inmates can expect temporary terms in segregated confinement under similar restrictions. *See Sandin*, 515 U.S. at 486 (thirty days); *Beverati*, 120 F.3d at 504 (six months).

Barnard contends that the conditions imposed under OP 830.A are atypical and significant, particularly IM status, because it is allegedly permanent. However, Barnard's own classification history belies this claim. He was classified to Level S and IM status after Red Onion officials were informed of his past association with members of a group that murdered the CODOC director and his continued communication with family members of that group. Barnard did not remain at IM status, however. By participating in the procedures of OP 830.A, he moved to less restrictive steps and, eventually, to SM-2. In so doing, he earned additional privileges, such as additional library books, visits, phone calls, and more out-of-cell socialization activities.

After careful review of OP 830.A, I conclude that this step-down procedure addresses and alleviates the isolating conditions and indefiniteness identified in *Wilkinson* and *Incumaa* as distinguishing factors of "atypical and significant" hardships presented by a prison's long-term segregation scheme. An IM-0 status inmate is subject to long-term, restrictive conditions, but that status need not be permanent or indefinite if the inmate chooses to participate in the step-down procedures. OP 830.A provides behavioral criteria for the inmate to qualify for incremental reductions of restrictions and increases in privileges. With concerted effort to change his thinking and behavior, he can earn his way to enjoyment of additional social interaction and activity while in segregated confinement. OP

-22-

830.A's steps allow him to make measurable progress toward reclassification to lower security statuses and, ultimately, to transfer to general population conditions. As such, under OP 830.A, an inmate's confinement in segregation at Red Onion is, for a likely majority of inmates, only as lengthy and restrictive as dictated by his own effort and behavior.

Barnard fears that reviewing officers could again rely on incomplete, inaccurate, or misleading information and arbitrarily continue to confine him in the most restrictive steps under OP 830.A. I conclude that the team assessment approach and the multi-level classification review procedures built into OP 830.A and the other VDOC policies protect against the possibility that any such willful or careless action will prevent or significantly delay any one inmate from advancing to less restrictive steps. Moreover, Barnard had an opportunity to provide the ICA with additional information about the Colorado investigation, to challenge the alleged procedural errors in these classification proceedings through the Offender Grievance Procedure, OP 830.1(IV)(G), and to file a request for an interim review of his classification based on procedural or calculation errors. (*See* OP 830.1(IV)(E).)

For the reasons stated, I find no material fact in dispute on which Barnard can establish that his confinement at Red Onion under OP 830.A is atypical and significantly harsh compared to conditions contemplated by his sentence.

Conditions there, while restrictive, can improve in defined stages based on Barnard's own efforts toward cognitive and behavioral changes. Indeed, the OP 830.A procedures themselves prevent confinement at Red Onion from falling into the category of indefinite isolation identified in *Wilkinson* and *Incumaa* as triggering constitutional due process protections. Thus, I conclude that Barnard has no constitutionally protected liberty interest in avoiding any particular security classification or reclassification under OP 830.A. Therefore, he also has no actionable claim under § 1983 that any particular procedural protection is constitutionally required during the OP 830.A classification proceedings. *Sandin*, 515 U.S. at 486-87.

Barnard also has no claim under § 1983 that any of the defendants have misconstrued or misapplied the OP 830.A procedures themselves. Barnard raises complaints about the procedures used to assign him to IM status, officials' failure to obtain his file or investigate his involvement in the CODOC director's murder, and his inability to earn more privileges after months of being infraction free. These actions are, at most, alleged violations or frustrations of the OP 830.A policies themselves. State officials' failure to abide by state procedural regulations is not a federal due process issue, and is, therefore, not actionable under § 1983. *Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants

-24-

more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

For the stated reasons, the defendants are entitled to judgment as a matter of law as to Barnard's claims that one or more of them violated his constitutional rights by changing his classification under OP 830.A without due process. I will grant the Motion for Summary Judgment on Barnard's due process claims accordingly.

### C. Equal Protection.

The Equal Protection Clause[9] generally requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). It "does not take from the States all power of classification, but keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks and citations omitted). Thus, to prove an equal protection claim, an inmate "must first demonstrate 'that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Id.* (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). He must next show

---

[9] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

that the policy is not "reasonably related to [any] legitimate penological interests."
*Veney*, 293 F.3d at 732 (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)). This
element requires the inmate to "allege facts sufficient to overcome the presumption
of reasonableness applied to prison policies." *Id.* Barnard does not state facts
supporting these necessary elements of his equal protection claim.

First, Barnard has not demonstrated that he was similarly situated to other
newly arrived inmates at Red Onion when officials classified him to Level S and
IM-0 status. He was transferred to Red Onion from another state, had received a
life sentence without parole for murder, and had a history of association with the
group that had murdered the CODOC director. All these facts reasonably triggered
security concerns for VDOC officials pending assessment of his current attitudes
and behavior for the appropriate housing assignment. Thus, in the initial
classification decisions and early step assignment reviews, officials could lawfully
treat Barnard differently from other segregation inmates with histories of less
serious or violent prison incidents within the VDOC system or with less severe
sentences.

Second, Barnard does not show that he has been treated differently than any
other inmate during periodic reviews for step changes. Neither Barnard nor any
other Level S inmate will change his step status under OP 830.A merely by
avoiding disciplinary convictions and being polite. A step change requires his

-26-

progress on the *Challenge Series* curriculum and the classification officers'
recognition that he is working to make positive changes in his thinking and
behavior.

Third, while the OP 830.A step-down procedure purposefully treats SM and
IM status inmates differently, these differences are rationally related to legitimate
governmental purposes. Namely, this procedure reasonably uses the incentive of
earning increased privileges and lower restrictions to encourage improved offender
behavior and self-development "in a manner that maintains public, staff and
offender safety." OP 830.A(I). The logical connections between the policy's
provisions and the furtherance of its legitimate penological goals are self-evident.
*See Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("[I]nternal [prison] security [is]
perhaps the most legitimate of penological goals.").

For the stated reasons, I find no material dispute of fact on which Barnard
could prove an equal protection violation here. Therefore, I conclude that the
defendants are entitled to summary judgment as a matter of law and will grant their
motion on this claim.

### D. Eighth Amendment.

Barnard's final challenge to OP 830.A asserts that his status under OP 830.A
offends the prohibition against cruel and unusual punishment of the Eighth
Amendment, which "protects inmates from inhumane treatment and conditions

-27-

while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "[T]he Constitution does not mandate comfortable prisons," however, and conditions that are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981). It is well established that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (internal quotation marks and citations omitted).

To sustain an unconstitutional conditions claim, a prisoner must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). The prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

Barnard's allegations do not show that he suffered any Eighth Amendment violation while subject to the living conditions under OP 830.A at Red Onion. Barnard does not allege that he was deprived of any necessity for life, such as food, shelter, or medical care. Rather, he complains about higher levels of restraint and fewer privileges. He fails to allege that these restrictions have caused him any

-28-

serious or significant harm.  For the stated reasons, I find no material dispute of fact on which Barnard could prove his claim that he was subjected to unconstitutionally cruel conditions while at Red Onion.  Accordingly, I will grant the defendants' Motion for Summary Judgment as to his Eighth Amendment concerns.

III.

For the reasons stated, I conclude that Barnard's constitutional challenges to OP 830.A are without merit, and the defendants are entitled to summary judgment as a matter of law.  It is accordingly **ORDERED** that the defendants' Motion for Summary Judgment (ECF No. 30) is GRANTED.

A separate judgment will be entered herewith.

ENTER:   September 26, 2016

/s/  James P. Jones
United States District Judge